**In the Matter of Roman & Regina LECH, Debtors.**

**Bankruptcy No. BK86–3632.**

United States Bankruptcy Court, D. Nebraska.

Dec. 18, 1987.

Donald Swanson, Schmid, Mooney & Frederick, Omaha, Neb., for debtors.

Steven Russell, Asst. U.S. Atty., for U.S.

## MEMORANDUM OPINION

TIMOTHY J. MAHONEY, Bankruptcy Judge.

Evidentiary hearing was held in Omaha, Nebraska, on December 16, 1987, on an amended motion filed by the debtors moving the Court for an Order determining that the ASCS/CCC has violated the confirmed Chapter 12 plan and/or discriminated against the debtors in violation of 11 U.S.C. Section 525(a). Donald Swanson of Schmid, Mooney & Frederick, Omaha, Nebraska, appeared on behalf of the debtors. Steven Russell, Assistant United States At-

torney, appeared on behalf of the governmental entities.

*Facts*

Debtors are family farmers as defined in 11 U.S.C. Section 101(17). Debtors filed a voluntary petition under Chapter 12 of the Bankruptcy Code on December 23, 1986. They filed several plans pursuant to the requirements of Chapter 12 and this Court confirmed the second amended Chapter 12 plan on or about July 13, 1987.

Debtors filed their first plan on March 20, 1987. That plan at Paragraph 2.3 identified the treatment that the debtors would provide for payment of a debt owed to the Commodity Credit Corporation (CCC) which was secured by a steel building used as a grain bin. The CCC with regard to that particular debt obligation was identified as a Class 6 claimant. Paragraph 2.3 of the original plan stated:

> Class 6 claims secured by a steel building will be paid in full by a setoff of sums owing from the Class 6 claimant to Debtors. Class 6 claims secured by grain will be satisfied by surrendering grain, redeeming grain, or as otherwise provided by CCC regulations.

In addition to owing the CCC for the grain bin, the debtors owed the CCC approximately $61,000 on the petition date resulting from a commodity loan. That loan was secured by an interest in corn stored on the debtors' premises. Each year prior to 1987 the debtors had entered into an agreement with the CCC for such storage arrangements and received a payment from the CCC for storing the grain.

On the date the petition was filed, December 23, 1986, there existed a contract between the debtors and the CCC regarding such storage, and storage payments had been paid in advance from the CCC to the debtors early in 1986.

By its terms, the contract concerning payments to the debtor for the storage of the grain expired on December 31, 1986. See Government Exhibit # 19.

In January of 1986, the debtors received approximately $4,700 from the CCC as an advance storage payment pursuant to the terms of the agreement. Prior to filing the bankruptcy petition, the debtors did not execute a new agreement for the calendar year 1987. The CCC did not notify the debtors prior to bankruptcy, nor until approximately two weeks ago, that the debtors were not eligible to receive storage payments during 1987. Debtors assumed, both prior to filing bankruptcy and thereafter, that they were eligible and actually "in" the 1987 program and would be receiving approximately $4,700 in storage payments in 1987 and in later years.

However, the CCC now claims that the debtors are not eligible to receive the 1987 storage payments, that they were not in the 1987 program and that they actually were not eligible to receive the 1986 payments and should not have been permitted to enter into the program for 1986 nor permitted to receive any storage payments in 1986. Testimony from Roger Cook, the County Executive Director of the Valley County ASC Committee, indicates that the debtors should not have been permitted to participate in the storage program in 1986 because debtors had previously disposed of grain which was collateral for a 1984 loan without the appropriate permission. Mr. Cook alleges that the debtors knew or should have known of their ineligibility because of a letter dated October 28, 1985, from the County Executive Director to Mr. Lech which was submitted into evidence as Government Exhibit # 16 and because of the minutes of the Valley County ASC Committee on Wednesday, June 26, 1985, submitted into evidence as Government Exhibit # 1 and because of a letter directed to Mr. Roman Lech on June 27, 1985, Government Exhibit # 2. This Court has read each one of the exhibits suggested by Mr. Cook as authority for debtors' noneligibility and finds that none of the exhibits say anything about debtors' eligibility for the special producer storage loan program referred to in the agreement identified as Government Exhibit # 19.

Mr. Cook also testified that in addition to the documents previously referred to, the debtors were ineligible because of regulations that he is required to follow. Those

regulations apparently are in some type of office manual which was not admitted into evidence and the terms of which were not described. Finally, Mr. Cook testified that the debtors were not eligible for the 1986 or 1987 or future storage payments pursuant to a special producer storage loan program because of an audit conducted by the Office of Inspector General of the Department of Agriculture. The audit was not provided to the debtors or to debtors' counsel, nor was it submitted into evidence at this hearing. Mr. Cook further testified that he was not permitted to discuss the audit results with debtors or with debtors' counsel and, therefore, did not notify them of their ineligibility. When he discovered the ineligibility, after the debtors had executed the 1986 agreement, Exhibit # 19, and after the debtors had received the 1986 payment, Mr. Cook apparently made an administrative decision not to require debtors to repay the storage payments and did not mention to any person, including the debtors, that the debtors were receiving payments that they were not allowed to receive.

Since the debtors assumed that they were in the 1987 program and would be receiving funds for storage in 1987, and since they thought that the CCC had a perfected security interest in the grain bin, the first plan that was filed by the debtor on March 20, 1987, contained the language of Paragraph 2.3. Approximately $3,200 was owed on the grain bin and the debtors proposed at Paragraph 2.3 to permit a setoff of the storage payments to the extent of the debt owed on the bin. Their plan proposed that they would receive the remaining balance of the storage payment and would continue with their CCC loans, subject only to the regulations concerning redemption or surrender of the grain at the time the notes matured.

Although the debtors believed that the CCC had a perfected security interest in the grain bin, the officials of the ASCS/CCC knew better. They had known for several months prior to the filing of the first plan that the perfection of the CCC security interest had lapsed by failure to file a continuation statement. CCC agree-

ments are administered by employees of the ASCS, a U.S. Government agency. Officials of the ASCS did not notify the debtors of the lapse. However, officials of the ASCS did review the first plan and did direct their legal counsel to object to the plan. Government Exhibit # 12 is a memorandum from the Nebraska State Office of the ASCS to general counsel dated April 16, 1987. By that memorandum, the officials notified their counsel that debtors were not participating in any government program that would entitle debtors to payments from the government. Therefore, the memorandum alleges that there are no funds as of that date which could be set off against the bin payment. The memorandum goes on to suggest that instead of setoff, the debtor should pay the bin payment in full over five years.

General counsel did not file an objection to the March 20, 1987, plan and no person from the ASCS suggested to the debtors or debtors' counsel that setoff was inappropriate or that debtors would not be receiving any funds in 1987 or that the Government's perfection of the security interest in the bin had lapsed so the CCC was not a secured claimant with regard to the amount owed for the bin.

For reasons other than problems with the CCC, the plan was amended on May 20, 1987. But this amendment contained the same language at Paragraph 2.3 concerning the setoff and payments concerning the bin as well as the continuation of the loan program that the debtors had been involved in. This amendment had been filed after counsel for the debtor had specifically requested of at least two officials of the ASCS to verify that the setoff could be done. Mr. Cook was one of the officials and Doy Unzicker, the Nebraska State ASCS Program Specialist based in Lincoln, Nebraska, was the other official. Mr. Stowell, counsel for the debtors at the time the plans were proposed, testified that he made specific inquiry of both Mr. Cook and Mr. Unzicker and eventually inquired of Mr. Hall, another state official, concerning the setoff procedure. According to Mr. Stowell, none of the ASCS employees informed

him that the debtors were not eligible for payment or that the debtors were not involved in the 1987 program. Instead, according to Mr. Stowell, Mr. Unzicker told him that there would need to be an inspection of the grain by the local committee before the setoff procedure could be approved. The inspection was completed and Mr. Stowell testified that he was informed that everything with the grain was satisfactory. Mr. Stowell did not at any time receive an affirmative statement from any of the ASCS officials that the setoff procedure was appropriate.

Mr. Stowell then filed the amended plan on May 20, 1987, containing the setoff language contained in Paragraph 2.3. No objection was filed by the Commodity Credit Corporation. Mr. Stowell testified that he was asked by at least one of the ASCS employees to put particular language in the plan to reflect the fact that the debtors would continue to deal with the ASCS agreements pursuant to the regulations. To comply with this request, Paragraph 2.3 was amended in the final plan that was eventually approved. That plan, admitted into evidence as Plaintiff's Exhibit # 3, changes the language of Paragraph 2.3.

Prior to the final plan being filed, Mr. Stowell contacted the state officials by letter requesting a verification that the setoff proposed in Paragraph 2.3 or an exchange of checks which would accomplish the same result, was a satisfactory procedure. Those letters were sent by Mr. Stowell on July 6, 1987, to Mr. Norman Hall and Mr. Doy Unzicker, both at the state office of the ASCS. Copies of those letters were admitted as Plaintiff's Exhibit # 4. No response was ever received.

On or about July 9, 1987, there was a confirmation hearing on the second plan. At that hearing, debtors' counsel was made aware by counsel for another creditor that the perfection of the CCC security interest in the grain bin had lapsed and that the CCC was not a secured claimant with regard to the amount owed on the bin. With that knowledge and as a result of other agreements being reached with other creditors, debtors filed their final or second

amended Chapter 12 plan and, pursuant to Court order, provided notice to all creditors, including the ASCS that objections to the plan needed to be filed within a certain time period or it would be confirmed. No objections were filed and the plan was confirmed.

The appropriate ASCS officials had notice of the terms of the plan which included the amended Paragraph 2.3 providing that the CCC claim concerning the bin was an unsecured claim and providing that the debtors assumed all executory contracts regarding grain in the possession of the debtors. All of the appropriate ASCS officials received notice that the assumptions upon which the plan were based included the receipt by the debtors of storage payments of approximately $4,700 per year.

The ASCS employees, Mr. Cook, Mr. Unzicker and Mr. Hall, each testified that they were never asked whether or not the debtors had a right to receive the government payments. Therefore, they did not tell Mr. Stowell that the debtors were not only ineligible for the 1987 payments but they shouldn't have received 1986 payments and that if the plan were confirmed, they would simply call the underlying note and demand delivery of the collateral. They each testified that if they had realized Mr. Stowell was assuming that the debtors were "in" the program and that payments were due the debtors, they would have or at least should have informed Mr. Stowell of his error. They each thought that Mr. Stowell simply was inquiring whether or not the debtors could get into the 1987 program and couched their responses appropriately to that inquiry.

This Court, although not making any finding as to the intent of the individual ASCS employees, simply finds their testimony incredible. The evidence leads this Court to conclude as a fact that the ASCS employees knew the bin claim was unsecured; knew that the debtors were not eligible for 1987 payments or any other payments; knew that the plan included such payments; knew that the debtors intended to continue the status quo with regard to their loans with the CCC; knew

that the debtors and their counsel believed that either by the bankruptcy filing on December 23, 1986, or by some other procedure, that the debtors were "in" the programs for 1987 and future years or would be permitted to execute the appropriate government documents to enable them to continue to participate pursuant to the terms of the plan. Knowing all of this, the ASCS employees still failed to tell either the debtors, counsel for the debtors or this Court that the government would rely on some 1985 notification to the debtors to deny them any further participation or payment under any government programs.

The second amended plan was confirmed by this Court without objection in July of 1987. On September 23, 1987, the Nebraska State ASCS Office by Mr. Hall directed the Valley County ASCS Committee to issue a Delivery Notice to the debtor instructing him to deliver the commodity, that is, the corn in possession of the debtor subject to the security interest of the CCC, to the CCC. This directive is contained in Government Exhibit # 14. In addition to calling the loan, which is what Government Exhibit # 14 actually does, the State Office directed that the County Committee should prepare a claim form concerning the amount remaining due on the bin loan and send the paperwork to the State so that the State Office personnel could make a determination of uncollectibility.

The state directive to the county office came just a few days after counsel for the debtor had requested information from the state office concerning the date when the debtors could expect to receive payment of the 1987 storage amounts. In response to the telephone request for such information on or about September 18, 1987, the employees of the state office requested a copy of the order confirming the plan. Counsel for the debtors sent a copy of the order confirming the plan on September 18, 1987, and the response, rather than information concerning payments, was the directive to the County Committee to call the note.

Even at that time, the State Office did not inform counsel for the debtors that the debtors were ineligible for any payment or that the debtors would not be receiving any payment for the 1987 storage.

Debtors had retained the corn in their storage facilities from the first day of 1987 until final delivery was made pursuant to the September 23 directive on or about October 30, 1987. The ASCS had never objected to the plan. The ASCS had not moved for relief from the automatic stay for permission to enforce its alleged rights in the collateral. The ASCS permitted debtors to retain the collateral in storage for ten months in 1987 even though the ASCS employees knew that the debtors were not eligible for and would not receive any payment for such storage. In addition, the order directing the loan to be called and the collateral to be delivered came at a time when other producers had already arranged for storage facilities for the 1987 crop. As a result, debtors were precluded from receiving payments from the government for 10 months of storage and were precluded from contracting with others for the use of the bins for storage of 1987 crops.

Shortly after receiving notice that the loan had been called and delivery was demanded, debtors filed the motion requesting this Court to enjoin the ASCS/CCC from discriminating against the debtors pursuant to Section 525 of the Bankruptcy Code. Such motion alleges that the debtors are participants in farm programs, that they are not in violation of the farm programs or default under the terms of their agreements with the Government, that the Chapter 12 plan was confirmed in which the contract had been assumed, that the unsecured debt owed to the ASCS/CCC had been discharged pursuant to the plan and that as a result of such discharge, the ASCS/CCC had retaliated by refusing to allow the debtors to continue participation in the program. At the time the motion was filed, no employee of the ASCS had yet informed counsel that the ASCS was taking the position that the debtors were not entitled to be, nor were they, program participants in any programs as of December 31, 1986.

On the date of trial, after the ASCS employees had finally disclosed to debtors' counsel that it was the position of the ASCS that debtors had no contract which could be assumed nor did they have any rights to storage payments because they were not entitled to participate, the motion was amended to include an allegation that the ASCS/CCC was violating the terms of a confirmed plan.

### Discussion and Conclusions of Law

■ The Bankruptcy Code prohibits governmental units from discriminating against individuals solely on the basis that they have filed a bankruptcy case or discharged certain debt owed to the Government.[1] The effect of an order of confirmation in a Chapter 12 case is to bind the creditor to the terms of the plan whether the creditor has objected or not.[2] The CCC through its agents or representatives, has known from a date prior to the filing of the first plan of reorganization in this case that the claim concerning the bin was an unsecured claim. The CCC by failing to object to the first two plans, acquiesced in the debtors' proposal to treat the CCC as a secured claimant with regard to the bin debt. Such agents or representatives of the CCC did not bother to inform counsel for the debtor, at any time, that the claim was actually unsecured and that if the first or second plan were confirmed, the CCC would receive more and would be treated differently than it should have been treated if counsel for the debtor had realized that the perfection of the CCC's security interest had lapsed.

■ Eventually, with no help from the CCC, the debtors realized that the claim of the CCC with regard to the bin was unsecured and amended the plan to treat such claim as unsecured and dischargeable. The plan was confirmed without objection by the CCC. Within five days of receiving a copy of the order of confirmation treating the bin claim as unsecured, the CCC instituted action to call all notes and require delivery of collateral, thereby effectively cutting off debtors' apparently valid right to obtain storage on an ongoing basis and to continue to participate in the CCC programs.

This Court concludes that the actions of the CCC are discriminatory under Section 525 of the Bankruptcy Code. On the date of the bankruptcy the debtors did have an agreement or a "grant" with the CCC, which included the outstanding loan, the rights to extend the loan on a year-to-year basis as had been done in the past, and the special producer storage agreement and the right to extend it as had been done in the past. The notices that the Government alleges were sufficient to inform the debtor of his ineligibility for such programs simply do not inform anyone, including this Court, that the agreements in place would not be extended beyond December 31, 1986.

The notices do not specifically state what the ASCS employees claim they mean and the ASCS itself, through its agents, did not even realize the 1985 County Committee minutes and notices meant that the debtors were not eligible to continue to participate. This is evidenced by the fact that the very County Committee which issued all of the notices permitted the debtors to enroll in

---

1. 11 U.S.C. § 525(a): *"A governmental unit may not* deny, revoke, suspend, or *refuse to renew a* license, permit, charter, franchise or other similar *grant to,* condition such grant to, discriminate with respect to such grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, *a person that is or has been a debtor under this Title* or a bankrupt or a debtor under the Bankruptcy Act, or another person with whom such bankrupt or debtor has been associated, *solely because such bankrupt or debtor* is or has been a debtor under this Title or a bankruptcy or a debtor under the Bankruptcy Act … or *has not paid a debt that is dischargea-*

*ble in the case under this Title."* (Emphasis added).

2. 11 U.S.C. § 1227(a): "Except as provided in Section 1228(a) of this Title, the provisions of a confirmed plan bind the debtor, each creditor, each equity security holder, and each general partner in the debtor, whether or not the claim of such creditor, such equity security holder, or such general partner in the debtor is provided for by the plan, and whether or not such creditor, such equity security holder, or such general partner in the debtor has objected to, has accepted, or has rejected the plan."

the program for 1986. If the County Executive Director and the County Committee do not understand what their own notices say, the debtors should not be expected to understand it either.

There is no credible evidence before the Court on behalf of the ASCS/CCC that the September 23, 1987, loan call was a result of anything except a retaliation by the CCC for action by the debtors in treating the bin loan as unsecured rather than secured.

The ASCS/CCC is in violation of Section 525(a) of the Bankruptcy Code.

■ Concerning the effect of the plan on the rights of the debtors and the obligations of the CCC, it appears that this is a case of first impression, particularly under Chapter 12 of the Bankruptcy Code. The plan says the debtors will continue with the government programs in place at the time the bankruptcy was filed. The plan says that the debtors will receive, pursuant to those programs, certain storage payments in 1987 and in the future. The CCC does not object to the terms of the plan even though they had three opportunities to do so. The CCC does not even inform either the Court or debtors that there is any problem with eligibility for continuing in such programs or receiving storage payments in 1987 or in the future until this action is brought before the Bankruptcy Court. The confirmed plan at Paragraph 2.3 provides, among other things, "The executory contracts with the Class 6 claimant regarding grain now in the possession of Debtors are hereby assumed." Those executory contracts include the rights to extend the special producer storage loan program and include the terms of the agreement concerning the farm storage notes and security agreements.

Neither the debtors nor their counsel nor this Court was informed prior to confirmation that the CCC regulations or officials would not permit debtors to participate in the programs by extension of the agreements as had occurred in 1986 and prior years. Such failure to notify the Court by objection to the plan is acquiescence in the plan and this Court believes the CCC is now estopped from claiming debtors' ineligibility or from claiming that because debtors didn't sign the appropriate documents and the Secretary of Agriculture or his designated officials did not execute the appropriate documents, that the debtors' notes and agreements matured on December 31, 1986.

■ Section 1227 of the Bankruptcy Code binds the CCC as a creditor. The contracts were executory at the time the case was filed and they were assumed by the confirmed plan.

Debtors' original motion and the amended motion request this Court to enjoin the ASCS/CCC from future discrimination with regard to the farm programs and to enjoin the ASCS/CCC from violating the terms of the confirmed plan. This Court is not comfortable with the theory that it can or should enjoin the ASCS/CCC from taking actions which may violate 11 U.S.C. Section 525 or violate 11 U.S.C. Section 1227. The discomfort arises from the fact that the law prohibits such activity without a specific court order. On the other hand, because the ASCS/CCC ordered the corn delivered and the debtors no longer have corn available for storage which would earn storage payments, the debtors have been directly harmed by the actions of the ASCS/CCC and the plan as confirmed has been violated. An order directing the ASCS/CCC to return the corn to the bins and let the debtor continue to participate as if the debtors had not been deemed ineligible, is not a practical solution.

This Court will not permit the CCC or any other creditor to stand idly by and permit debtors and other creditors and this Court to engage in a Chapter 12 confirmation process which is doomed to failure because the "knowing" creditor does not see fit to inform the other parties and the Court of a basic legal or factual flaw in the proposed plan. Any creditor, including a government creditor, should be deemed to have waived any objections it may have to being an unwilling participant in the process if that "knowing" creditor has the opportunity to inform the Court of the problem and fails, intentionally or unintentionally, to do so.

Since this Court has found that the plan as confirmed treats the debtors as if they were eligible to continue participating in the government programs, an order based upon such finding is appropriate.

### Remedy for CCC violations

█ IT IS THEREFORE, ORDERED that the 1987 special producer storage payment that the debtors would have been entitled had they been eligible and had they executed the appropriate documents should be paid to the debtors within 30 days.

IT IS FURTHER ORDERED that the debtors should be deemed eligible for such program payments and that the debtors should be permitted to execute the appropriate documents or agreements within 30 days as if they had been eligible to do so prior to December 31, 1986, and the effectiveness of the executed agreement shall be retroactive to December 31, 1986.

IT IS FURTHER ORDERED that in the future, at least during the years in which the Chapter 12 plan is effective, the CCC is to treat the debtors as if the actions which supposedly causes them to be ineligible had not occurred. That is, the debtors, if otherwise eligible for participation in the programs, shall not be prohibited from participating in such programs solely as a result of shortages in the 1984 or 1985 sealed grain programs.

IT IS FURTHER ORDERED that the debtors shall not be deemed ineligible for any participation in the programs because the bin loan was discharged in bankruptcy.

Separate Journal Entry will be entered.